Ron HAMBY *v.* Waltrand Amelia HASKINS

81-241                                    630 S.W. 2d 37

Supreme Court of Arkansas
Opinion delivered March 29, 1982

*Rex M. Terry*, of *Hardin, Jesson & Dawson*, for appellant.

*Robert R. Cloar*, for appellee.

ROBERT H. DUDLEY, Justice. Appellee Waltrand Amelia Haskins and her sister were driving in rural Sebastian County one afternoon in June of 1976 looking for a garage sale. After they were unsuccessful in finding its location, they stopped at appellant Ron Hamby's house to ask directions. The yard was not fenced and there was a large dog on the ground near the porch. Appellee got out of the car, walked up on the porch and knocked on the door. No one answered so appellee stepped off the porch and started walking back to the car when the dog bit her on the left calf and subsequently began barking. Appellee got back in the car and her sister drove to the police station in nearby Hackett. The Hackett police officers went back to appel-

lant's residence and found it necessary to subdue the snarling dog with mace. An ambulance was called and appellee was transported to a hospital where she was treated and released. Because of gangrene and other complications, appellee was admitted to the hospital on two later occasions. Her medical bills totaled $1,734.45 and her loss of wages over a two-month period equaled $800. Appellee's complaint alleged strict liability and negligence on appellant's part as owner of a vicious dog and sought $20,000 in damages. Appellant responded that appellee was a trespasser on his property and that he had no knowledge of the vicious nature of the dog. Trial by jury resulted in a verdict of $12,000. We affirm.

Appellant argues that the evidence is insufficient to support a jury verdict because the appellee did not prove that the dog had a propensity to injure and that the owner had knowledge of those vicious tendencies. In *Bradley* v. *Hendricks,* 251 Ark. 733, 474 S.W. 2d 677 (1972) this court said:

> . . . It is well settled in Arkansas that when a person is injured by a domestic animal legally permitted to run at large by its owner, in order for the injured person to recover damages from the owner without the necessity of proving the owner's negligence, it must be shown that the animal has vicious tendencies or dangerous propensities and that the owner knew, or should have known, of such tendencies or propensities . . . The evidence as to the owner's knowledge boils down to a question of credibility and this too, is a question for the jury.

The jury found that appellant knew that the dog had vicious tendencies and there was substantial evidence for that finding. There was testimony that appellant knew the dog had been penned up by its prior owner. There was testimony that when police officers went back to appellant's residence to investigate, the dog began barking and snarling and attempted to bite both officers and they found it necessary to subdue the dog by the use of two cans of mace. The dog was then tied up for ten days in order to test it for rabies and appellant subsequently allowed the dog to roam free, even

though he knew it had bitten appellee. Subsequent conduct is admissible to prove the particular animal's dangerous nature. *Finley* v. *Smith,* 240 Ark. 323, 399 S.W. 2d 271 (1966). And language in *Reeves* v. *John A. Cooper Co.,* 304 F. Supp. 828 (W.D. Ark. 1964) is dispositive of appellant's claim that he did not have knowledge of the dangerous propensity of his dog.

> The rule of ascertaining scienter is that the knowledge need not necessarily be actual, in the ordinary acceptation of that term, either constructive or imputed notice being sufficient, and if in the exercise of reasonable diligence and common prudence the owner ought to have known that his animal was dangerously inclined and might, if unrestrained, inflict injury upon the person or property of another, he is chargeable with actual notice of vicious acts committed by it.

In determining the sufficiency of the evidence, we review the evidence and all of its reasonable inferences in the light most favorable to the appellee and affirm if there is any substantial evidence to support the finding of the jury. *Thrifty Rent-A-Car* v. *Jeffrey,* 257 Ark. 904, 520 S.W. 2d 304 (1975). Viewing the evidence and its inferences in the light most favorable to appellee there is substantial circumstantial evidence from which the jury could find that the appellant knew or ought to have known, of the vicious nature of the dog. Appellant continues this argument by contending that since he testified that he did not have actual knowledge of the dog's vicious tendencies the evidence is undisputed. But a party's testimony cannot be considered undisputed or uncontradicted. *Roberts* v. *Simpson,* 275 Ark. 181, 628 S.W. 2d 308 (1982); *Old Republic Insurance Co.* v. *Alexander,* 245 Ark. 1029, 436 S.W. 2d 829 (1969).

Appellant's second point for reversal is that the verdict was not supported by any substantial evidence of willful and wanton misconduct on his part. He urges this standard applies because appellee was classified as a trespasser in the instructions given to the jury and the only duty owed to a trespasser is not to willfully or wantonly injure him after his presence is known. *Southwestern Bell Telephone Co.* v.

*Davis,* 247 Ark. 381, 445 S.W. 2d 505 (1969); AMI 1102. [There were no objections to the instructions and we do not consider unargued issues. However, we do note that the doctrine of strict liability is the law in Arkansas with regard to an animal known to be vicious. *Strange* v. *Stovall,* 261 Ark. 53, 546 S.W. 2d 421 (1977)]. Appellant asserts that because neither he nor any of his family were at home when the incident took place then he could not be guilty of this type of gross negligence. The jury obviously found that the appellant was guilty of willful or wanton conduct by not having the dog penned up. The testimony showed that the dog's prior owner kept it penned up and this evidence, coupled with evidence that appellant allowed the dog to continue to roam free even after it bit appellee, was sufficient evidence on which to base the verdict.

The instruction may have been more favorable than necessary as the Restatement (Second) of Torts, § 330, p. 174, referring to a "license created otherwise than by words" is as follows:

> . . . "The well-established usages of a civilized and Christian community" entitle everyone to assume that the possessor of land is willing to permit him to enter for certain purposes until a particular possessor expresses unwillingness to admit him. Thus a traveler who is overtaken by a violent storm or who has lost his way, is entitled to assume that there is no objection to his going to a neighboring house for shelter or direction . . . .

This common sense statement is applicable to the case before us.

Appellant next contends that the matter of insurance was improperly included in voir dire. Counsel for appellee asked the jury panel if any of them, their spouses or close relatives were employed by an insurance carrier. One prospective juror mentioned that his wife had been employed by the company which he thought to be appellant's insurance company until a short time ago. A few others also mentioned connections with specific insurance carriers.

Appellant objected to the fact that the panel had been placed on notice that insurance was involved. The rule in Arkansas as to this point seems clear. In *Dedmon v. Thalheimer,* 226 Ark. 402, 290 S.W. 2d 16 (1956), this court said, "The test of whether counsel may ask questions of veniremen in regard to insurance is whether the questions are propounded in good faith." Since insurance was involved here, the question of good faith is settled. This issue was also discussed in *King v. Westlake,* 264 Ark. 555, 572 S.W. 2d 841 (1978) where this court said:

> . . . the purpose of voir dire examination is to enable counsel to ascertain whether there is ground for a challenge of a juror for cause, or for a peremptory challenge and that so long as counsel acts in good faith, he may in one form or another, question prospective jurors respecting their interest in or connection with liability insurance companies.

The general questions asked by appellee did not violate this rule. *DeLong v. Green,* 229 Ark. 100, 313 S.W. 2d 370 (1958).

Appellant's last point for reversal is that the damages awarded were excessive. Appellee's medical bills and lost wages totaled $2,534.55 and she was awarded $12,000. There was evidence as to pain and suffering by the appellee as she endured two subsequent hospitalizations, one for the removal of gangrenous tissue and the other for skin grafting. Appellee also spent two months recuperating at her parents' home with her leg elevated most of this time. Appellee now has two three-inch square scars which are clearly visible five years after the accident. There is no definite and satisfactory rule to measure compensation for pain and suffering and the amount of damages must depend on the circumstances of each particular case. *Morrison v. Lowe,* 274 Ark. 358, 625 S.W. 2d 452 (1981). Compensation for pain and suffering must be left largely to the sound discretion of a trial jury and the conclusion reached by it should not be disturbed unless the award is clearly excessive. *Missouri Pacific Railroad Co. v. Hendrix,* 169 Ark. 825, 277 S.W. 337 (1925). We do not find the award of damages so shocking that we will order a remittitur.

Affirmed.

ADKISSON, C.J., concurs.

HICKMAN, J., dissents.

DARRELL HICKMAN, Justice, dissenting. The facts and the law are equally significant in this case. Only an in-depth examination of both will reveal whether we have arrived at the right decision.

The appellee, Mrs. Haskins, was bitten by a dog at the rural residence of the appellant, Ron Hamby. She and her sister were in the vicinity of the appellant's farm looking for a yard sale. They stopped at the appellant's house to seek directions. They saw no vehicles nor anyone about the place. The appellee went to the door and, as she was returning to her vehicle, she said a "black and white dog" about the size of a collie bit her. They reported the matter to the local police in Hackett. The sister, two police officers, and the employer of the appellee's sister, returned to the appellant's house. Apparently both officers got out, saw a dog which growled and snarled at them, and then one of the officers "maced" the animal. The appellant was told of the incident and he put the animal up for the required number of days. Although the appellee sought medical treatment, gangrene set in and she suffered real injury. Later, the son of the appellant said he shot the dog because it was limping and he thought it had been struck by a vehicle.

The legal duty of an owner of a domestic animal is fairly well established. The owner has a duty to the public to either pen up that animal or warn the public of its presence. But there is no such duty unless an owner knows or clearly should have known the animal is vicious. *Bradley* v. *Hendricks*, 251 Ark. 733, 474 S.W. 2d 677 (1972). Of course the animal's location at the time of the injury is significant. In every case that we have decided, the animal has either been off the premises of the owner or in a public place. Furthermore, in every case we have decided, the evidence was substantial that the owner knew or clearly should have

known the animal was vicious or had a propensity to harm people.

In *Holt* v. *Leslie,* 116 Ark. 433, 173 S.W. 191 (1915), the Missouri & North Arkansas Railroad was sued when a bull dog bit the plaintiff. The dog had been shipped to Leslie, Arkansas from Missouri. It arrived in a crate, chained. The crate was marked, "Be careful. Hands off." There was an abundance of other credible evidence that the station master knew the dog was dangerous. Even so, he removed the dog from its crate and allowed his son to walk it about the station. (Evidently the man to whom the dog was shipped did not want it and delayed acceptance.) We upheld a verdict against the railroad and recognized the general doctrine regarding the liability of owners of domestic animals:

> If one knowingly keeps a vicious or dangerous animal, one accustomed to bite mankind, he is liable for injuries done by such animal, without proof of negligence as to the manner in which the animal was kept or handled. The mere keeping of such an animal, knowing its vicious and dangerous qualities, is at the risk of the owner *(except as to trespassers)* and renders him liable in damages to one injured by such animal. [Emphasis added.]

The *Holt* decision is significant for several reasons: (1) It was at a public place, a railroad depot; and, (2) The agent had direct knowledge the animal was dangerous before it bit the plaintiff.

In *Field* v. *Viraldo,* 141 Ark. 32, 216 S.W. 8 (1919), we dealt with a vicious bull. *It attacked the appellee one night at her home immediately in front of her house.* There was considerable evidence the bull had violent propensities when loose, as it had been on two prior occasions. We held the rule to be:

> . . . that the owner is liable for a *trespassing* animal whether he knows of the vicious propensities or not, and is liable for injuries inflicted by a vicious animal, not trespassing, *only in case of knowledge on the part*

*of the owner of such propensities of the animal.* The liability in one case rests on the fact that the animal is trespassing, and in the other on the *known* vicious propensities of the animal, the law placing on the owner the duty of restraining the animal of *known* vicious propensities. . . . [Emphasis added.]

*McIntyre* v. *Prater,* 189 Ark. 596, 74 S.W. 2d 639 (1934) is another vicious bull case. This bull attacked the plaintiff *while she was in her yard picking up wood.* It had broken out of its pasture. The plaintiff testified that the owner of the bull told her, " . . . the bull was vicious; and that it had been necessary to remove the bull from the farm operated by his brother to prevent the animal from injuring the children." Needless to say, we reversed a verdict in favor of the owner of the bull, holding it was for the jury to decide whether the owner knew the animal was vicious.

In *Bradley* v. *Hendricks, supra,* we considered a case of a dog biting a child. The incident occurred in the City of Morrilton, at the house next door to the child's residence. It did not occur at the residence of the owner of the dog. In *Bradley,* for the first time, we stated that an owner of a domestic animal could be held liable because the owner *"should have known* of such tendencies or propensities." But we were careful in applying that statement. We prefaced our decision in *Bradley* with the statement that " . . . The evidence in this case presents a close and difficult question" on substantial evidence. The evidence the dog had vicious propensities came from three witnesses. A Mr. Hendricks said the dog growled at him on more than one occasion as he went to work, and growled at his daughter and nipped at her heels when she passed in front of the owner's house. Two other witnesses said the dog had growled at them. We found this to be substantial evidence.

In *Strange* v. *Stovall,* 261 Ark. 53, 546 S.W. 2d 421 (1977), a child was bitten by a dog known to be vicious. The incident occurred at the child's grandparents' home. The dog belonged to relatives visiting the grandparents. The owner admitted to two witnesses the animal was mean and had bitten him several times.

How does this case square with our prior decisions? The most obvious difference, of course, is the fact that in this case the appellee was a trespasser. And the incident occurred at the owner's residence, a rural farm. Equally important, there is no evidence at all the owner knew the dog was vicious *before* this incident.

The owner in this case had a right to keep a dog at his farm and a right to expect people not to trespass. The appellee was an admitted trespasser on his property and the only duty owed her was not to injure her by a willful and wanton act. *Southwestern Bell Telephone Co. v. Davis*, 247 Ark. 381, 445 S.W. 2d 505 (1969). That legal relationship places the appellee in a position of having to meet a heavy burden of proof, much heavier than that of one who is an invitee, as was the case of the bull dog at the railroad depot, or, in every other case cited, where the incident occurred *off* the premises of the owner.

The jury was instructed in this case that the appellee was a trespasser and that the owner of the property owed the trespasser no duty until he *knew* of the presence of the trespasser on his property. And, most significantly, the jury was instructed, "An owner or person having custody of a domestic animal which he *knows* has a tendency to injure other persons keeps custody of that animal at his own risk and is liable for injury and damage caused by the animal. If, however, the damage occurs upon the defendant's premises and plaintiff is a trespasser, then the owner or keeper of the dog is only liable for injuries if he acted with willful and wanton misconduct which was the proximate cause of plaintiff's injury."

Of course if the owner in this case knew the dog was vicious, or even if he clearly should have known the dog was vicious, he should have either penned up the animal or posted a warning. But where is the substantial evidence the owner knew or should have known that in this case? And there is no evidence he knew of the presence of the trespasser.

The majority recites three facts to support its conclusions. I submit that two of them cannot stand examination

and the third, while more credible, cannot alone support a verdict.

The first fact cited is the bare statement the owner knew the dog had been penned up by its prior owner. The majority implies that the owner knew the dog had been penned up by its owner *because* it was vicious or had vicious propensities. I respectfully suggest the majority has inaccurately characterized the evidence. Only the record can settle my disagreement with the majority opinion.

The son of the appellant got this dog from a neighbor farmer about two weeks before the incident. The son had been with the dog when he fed the livestock of the neighbor who was absent from time to time. The son testified:

Q. He kept the dog penned up there did he not?

A. I let it run out some, but when I wasn't there I penned it up.

. . .

Q. Did Hardwick [the previous owner] keep the dog penned up or tied up?

A. No, Don didn't tie him — just when nobody was there.

There is no evidence that the son knew the dog was vicious before it was given to him or knew it had been penned up because it was vicious.

The second fact's import eludes me entirely. The majority finds that since the owner penned up the dog, for the required number of days after the biting, and *then* let the dog loose, that is evidence the owner knew the dog was vicious. How this bears on the issue that the owner should have known the dog would bite before it did, escapes me. If anything, it simply shows the owner did not consider the dog vicious at all. In fact the owner in this case seriously questioned whether his dog actually bit the appellee.

Evidence was offered that a German shepherd ran loose in the neighborhood which was known to have violent propensities.

The third fact used by the majority is the incident with the two policemen, which occurred *after* the appellee was bitten. Neither the appellant nor his son was there. The two policemen got out of their vehicle and when the dog snarled and growled at them, they "maced" it.

The relevant testimony from the officer reads:

Q. You said Mr. Miner [a policeman] used mace on him?

A. Yes.

Q. Did he attempt to bite Miner?

A. We were under the impression he was going to bite. Like I say, he showed his teeth and snarled at Miner and all of this. He was kind of a strange looking dog. He just stood there and looked at you eye to eye. He just stood there and looked at you when you turned your back on him. He was on the offensive.

Q. When you turned your back on him he would then get offensive?

A. Yes, sir. That was the situation we got in to. When Miner first got out and he was standing there looking at him, he was expecting the dog to do something and he didn't; he just stood there and looked at him. And when he started to turn around and turned his back it was when the dog started snarling and growling. Of course at that time, he just unloaded the mace on him.

Q. When he turned his back on him, did the dog approach him from the back?

A. It seems like he did.

. . .

A.   Refreshing my memory from the report, the dog did attempt to bite both of the officers while we were there.

Q.   Did you do anything to provoke the dog?

A.   No, sir.

. . .

Q.   When you had this impression that you testified about, you had the impression that the dog was going to bite, was that before or after Officer Miner sprayed him with mace?

A.   At that point Officer Miner's weapons were still in the holster and so were mine.

Viewing the testimony of the officers favorably, as we must, they were afraid the dog was going to bite them, but I cannot concede that the evidence was conclusive the dog "attempted to bite" both officers.

There was no evidence offered which showed this particular dog had violent propensities; that anyone knew the dog was vicious; or that anyone knew at any time, any place, or anywhere, that this particular dog had ever growled at, snarled at, or bitten anyone *before* this incident. And that is the issue: What the owner knew before the incident.

With all due respect, the precedent set by the majority opinion in this case is bad for two reasons: First, it completely ignores the duty of an owner of a domestic animal to a trespasser. In all of our cases similar incidents have either occurred off the premises of the owner, or at a public place — not on the private property of the owner. There is no evidence at all that the owner in this case knew that the dog was vicious before the incident. Second, it uses facts to support its conclusions that would not support a verdict against the owner of a domestic animal if our prior

cases control. The majority has not been as careful as we were in the *Bradley* case or its predecessors.

Where is the substantial evidence that this owner should have known of the propensities of this dog *before* the incident? Is an owner strictly liable to a trespasser in such cases based on facts which occur after the fact? That is contrary to AMI 1602 as amended by 1603. *See Strange* v. *Stovall, supra; Finley* v. *Smith,* 240 Ark. 323, 399 S.W. 2d 271 (1966); *Vangilder* v. *Faulk,* 244 Ark. 688, 426 S.W. 2d 821 (1938). Is an owner of a domestic animal to be held liable for an animal's act when there is no evidence at all that he should have known the dog would bite strangers? On his own farm?

I would reverse the judgment and dismiss the case.